Filed 4/13/26  P. v. Serrano CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>RUBEN MALDONADO SERRANO,<br><br>      Defendant and Appellant. | E084946<br><br>(Super.Ct.No. FSB14900-1)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Sabrina R. Damast, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Daniel Rogers and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Ruben Maldonado Serrano filed a motion to vacate his conviction pursuant to Penal Code section 1473.7,[1] which the court denied. On appeal, defendant contends the court erred in denying his motion. We affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

On June 23, 1997, according to the police report, an officer conducted a traffic stop on a vehicle driven by defendant. The officer asked defendant if there was anything illegal in the car. Defendant acted nervously and answered, "'not that I know of.'" The officer ran his K-9 around the exterior of the vehicle. The K-9 alerted to the undercarriage of the passenger side of the vehicle.

The officer obtained permission to search the interior of the vehicle. The K-9 alerted to the interior passenger side of the car. The officer examined the area and located several cellophane packages. He punctured one of the packages and found it contained a green, leafy substance, which he recognized as marijuana. He arrested defendant and the passenger.

Upon examination, the side panels of the vehicle were discovered to have been modified, with the edges taped to facilitate the transportation of drugs. Fifty-seven packages containing marijuana with a total weight of 168.24 pounds were found in the side panels of the vehicle.

The suspects said they borrowed the vehicle. They said they were traveling from Mexicali toward Huntington Park, where they were going to stay the night.

---

[1] All further statutory references are to the Penal Code.

While in the back of the patrol vehicle during the officer's search of their car, defendant was recorded as saying, "what are they going to do, open it?" Defendant said, "we are Damned." The passenger said, "they are going to take the parts off." Defendant said, "we should have waited for nightfall."

When they saw that the officer found the drugs, the passenger said, "look they saw it and touched it." She said, "he lent us it." Defendant responded, "yea, well he let us borrow it." The passenger replied, "and he took it to our house, that is all I know." "[W]e don't know anything." "[W]e will just act surprised."

On July 29, 1997, the People charged defendant by information with possession of marijuana for sale (Health & Saf. Code, § 11359, count 1), sale or transportation of marijuana (Health & Saf. Code, § 11360, subd. (a), count 2), and false compartment activity (Health & Saf. Code, § 11366.8, subd. (a), count 3). The People further alleged that defendant had suffered four prior strike convictions for robberies on May 10, 1985; July 22, 1985; January 5, 1993; and April 2, 1985. (Pen. Code, §§ 1170.12, subds. (a)-(d) & 667, subd. (b).)

On September 29, 1997, pursuant to a negotiated plea agreement, defendant pled guilty to counts 1 through 3. In return, the People agreed to strike the prior strike allegations and agreed to a sentence of the low term of two years of imprisonment. Pursuant to the plea agreement, the court struck the prior strike allegations and immediately sentenced defendant to two years in prison.[2]

---

[2] The reporter's transcript of the plea and sentencing is not included in the record.

On December 14, 2023, counsel for defendant filed a section 1473.7 motion to vacate his conviction.[3]  Counsel asserted that defendant was not advised that his convictions "were aggravated felonies, and mandatory deportable offenses, and also offenses that would render him permanently inadmissible to the U.S.  [Defendant] entered a guilty plea to this charge without knowing the immigration consequences it carried.  [¶]  If [defendant] had meaningfully understood that this conviction would result in his deportation and exclusion from the United States, he would have investigated further, realized the actual immigration damage it would cause, and sought to avoid them by renegotiating the plea bargain or by taking the case to trial."

"At the time of his conviction, [defendant] was lawful permanent resident (LPR) and had ability to go back and forth between Mexico and the U.S., which he often did. He considered the U.S. his home, where he had resided for almost a decade.  He was in a committed relationship with his wife who was also a lawful permanent resident and today is a naturalized United States citizen, and they had started a family which included 2 sons and 4 daughters (all were born in the United States of America).  He would have never chosen to jeopardize the possibility of remaining in the U.S. with his family."

---

[3]  The originally filed record on appeal did not contain defendant's motion, the People's opposition, or the People's opposition exhibits.  Defendant filed a motion to augment the record with these materials, which we granted.

4

Defense counsel attached to the motion a declaration by defendant averring that defendant was born on September 5, 1948; he first entered the United States in 1970,[4] he began working as a laborer; he married a United States citizen; and he has six children who are United States citizens.

Defendant was arrested on June 23, 1997. "I . . . had knowledge that I was committing a crime, but I didn't know it was marijuana in the car." At that time, he was a permanent resident; he was warned to plead guilty or he would be deported; he pled guilty; he "did not understand that this conviction would make me inadmissible, resulting in mandatory deportation and permanently prohibiting me from any type of immigration relief, even if served my jail sentence"; "I don't remember knowing that I was being represented by an attorney, I only remember talking to several people through an interpreter;"; "After reviewing the record, I understand that I was represented by private attorney, Richard Nahigan"; "I don't remember Mr. Richard Nahigan, or anyone who asked me about my immigration status"; "In 1997 I was not fluent in English, I relied on a court interpreter to recount what the judge told me during the court proceedings. I don't remember that either the judge or the interpreter ever mentioned the immigration consequences"; "I don't remember the interpreter translating the change of plea form for me word for word, explaining what each section meant"; "Instead, I was simply told to

---

[4] The Spanish language version of defendant's declaration reads that defendant entered the U.S. in 1964, which comports with his testimony. Thus, we can rationally infer that the year 1970 in the English version was an error that occurred when the declaration was translated. The court below said as much: "If you look at the declaration, the one in Spanish says 1964, the translation submitted has 1970. It's the wrong date in the translation."

initial and sign in a particular place on the form"; "While I was serving my sentence for this case, the Department of Homeland Security served me with Notice, charging me with removal due to the conviction in this case, they will order me deported."

"I pleaded guilty without understanding that doing so would cause me immigration problems in the future. Although I would likely benefit from a substantially lower sentence, if I had known that I would be deported, inadmissible, and ineligible for most forms of Immigration Relief by accepting the guilty plea, then I would never have pleaded guilty. Instead, I would have gone to trial OR pleaded guilty to a different charge, even if it meant pleading guilty to a more serious charge."

"I never wanted to jeopardize my ability to remain in the United States, at the time of this incident I was 49 years old and had lived in this country almost a lifetime. I had legal permanent resident status; I had my home in the U.S. My family, my wife, my family was young, and I wanted to get my family ahead. [¶] Today I am 75 years old, I am 20 years resident in Mexico, complying with the rules of the countries of Mexico and the USA."

"Two years ago, in 2021, I obtained an immigration and humanitarian pass to go to a grandchild's funeral, I complied with the rules and returned to Mexico after this immigration pass, I could have violated the laws and remained in the U.S." "[M]y daughter . . . [who is ] 43 years old . . . suffers from diabetes and epileptic seizures." "My wife is very old, and she desperately needs my help in the United States. I have come to

6

the U.S. to help with the care of our daughter . . . . [M]y daughter is in serious condition, and I ask for this forgiveness to return to the U.S. [to] [h]elp with my daughter."

Defense counsel filed a declaration in which he averred that, "If I had been consulted about this case prior to the decision of whether to accept the plea offered by the District Attorney, I would have recommended in the strongest possible terms that [defendant] avoid a conviction under section[] 11359 of the Health and Safety Code due to the adverse immigration consequences set forth above. There were alternative pleas that could have been pursued that would not have rendered him inadmissible and deportable." "At the time of this case, [defendant] could have plead to a specific substance that does not appear on federal drug schedules, such as chorionic gonadotropin or khat for [Health and Safety Code sections] 11377-79."[5]

"A plea to [Health and Safety Code sections] 11360 or 11379 specifically to transportation for personal use, offering to transport or offering to give away a small amount might have helped avoid the trafficking consequences." "Today, one possible alternative plea is a plea to Penal Code section 32 (accessory after the fact). This felony is not considered a controlled substance offense under federal immigration law and therefore is not a drug conviction for immigration purposes even where the principal offense involves drugs. [Citation]. A plea to this felony with the same terms and

---

[5] Defense counsel's declaration is not in the form required by California Code of Civil Procedure section 2015.5. "A declaration not signed under penalty of perjury under the laws of California has 'no evidentiary value' and can be disregarded. [Citation.]" (*Safieddine v. MBC FZ, LLC* (2024) 103 Cal.App.5th 1086, 1094, fn. 9.)

7

conditions as his instant offense would allow [defendant] to remain eligible for obtaining lawful admission status." Several character letters were also attached to the motion.

On March 21, 2024, the People filed opposition. The People objected to the admission of defendant's declaration on the basis that it was hearsay, had not been subject to confrontation and cross-examination, and had not been made under penalty of perjury. The People further alleged that defendant failed to prove he had acted diligently in seeking relief. The People also maintained that defendant had failed to provide documentation of his, at one time, purported lawful permanent resident status, or "even copies of the correspondence given to him by the Department of Homeland Security, Customs and Border Patrol or from any federal immigration court."

The People additionally alleged that defendant's "motion fails to explain how this conviction is harming him, under immigration law, given his other convictions and adverse immigration actions." The People attached records reflecting defendant's criminal convictions as follows: aiding and abetting the entry of illegal aliens on May 14, 1970; illegal transport of illegal aliens on March 16, 1973; possession and transportation of controlled substances on June 22, 1976; robbery and assault with a firearm on a peace officer on May 10, 1985; grand theft auto on August 22, 1989; possession of a controlled substance, being under the influence of a controlled substance, and possession of drug paraphernalia on December 20, 1990; being under the influence of a controlled substance on May 8, 1991; robbery and false identification to a peace officer on January 5, 1993;

the instant offenses on September 26, 1997; and bringing in and harboring aliens on October 3, 2011.[6]

Additionally, defendant had been arrested, but not convicted, for smuggling illegal aliens on July 23, 1970; transporting aliens on October 6, 1970; attempted entry with the documents of another alien on September 4, 1971; attempted escape from United States custody on August 6, 1973; intent to bring fraudulent currency into the United States on July 31, 1981; and murder on April 13, 1995. Defendant also had illegally entered the United States on at least four documented occasions, violated parole twice, and had been deported six times.

At a hearing on March 21, 2024, the court noted that defendant's declaration reflected that he "received notice of removal while serving his sentence in this case. That was a long time ago." The court observed that, based on the declaration, it did not appear defendant had acted diligently. However, the court wanted to give defendant the opportunity to testify with respect to that issue.

After the People requested that the court rule on whether defendant had made a prima facie case, the court responded, "I do think there's some questions that I have that raise an issue in this case that's different than in some of the other cases I've seen." The court noted that defendant had retained counsel, another attorney "appeared and signed the plea," and yet another "represented the defendant at the hearing." "So I have some

---

[6] Notably absent from the People's exhibits reflecting defendant's criminal history are two of the four robbery convictions alleged as prior strike convictions in the information: the ones listed as occurring on April 2, and July 22, 1985.

questions about what the defendant was told and by whom, and I think those are legitimate questions raised by this motion that I don't normally see."

Defendant testified, with the assistance of an interpreter, that he was born in September 1948, and entered the United States in April 1964. In September 1997, defendant was convicted in the instant case while he was a lawful permanent resident. He pled guilty with the assistance of an interpreter. Defendant signed a document entering the plea. No one advised him of the potential immigration consequences of his plea. Defendant did not find out about those consequences until he was in prison. He was deported in 1998.

When asked why it took him so long to seek to vacate his plea, defendant responded, "Because I had in the past done it, but they would tell me no. And then that happened with the Court and the system being down, so I tried several times, and it was rejected. [¶] So I—I tried again because my—I'm trying now because my daughter is very ill, she's on dialysis, she's diabetic. My wife is alone and helping her. Helping her daughter because she is ill. She has diabet[es], she's on dialysis. And my wife is old and needs some help."

From the time that he was deported, he had never illegally entered the United States. "I've always entered legally. When my grandson [] died, I was given permission to come over for two days to bury him in California." Defendant denied being arrested after his deportation for "bringing aliens into the United States on July the 2nd, 2011."

He denied being deported on any occasion other than in 1998. Defendant denied having suffered felony convictions prior to 1997.

With respect to the plea agreement, defendant did not recall initialing the individual provisions: "I do not remember that. It's been so long ago. All I remember is that at the end, at the final time, I signed guilty, I signed that paperwork as guilty. That's all I remember. I don't remember the initials."

Specifically, defendant had no memory of initialing the provision reading, "'I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, or denial of naturalization may result from a conviction.'" "No, I do not remember that. I just know that I stated that I was guilty. That's all I remember. What I was told by the judge. I said I was guilty, then I signed. In regards to that document, I have no idea."

The attorneys did not tell him he would be deported because of the plea. The court asked defendant, "Do you remember that you were not told, or is it that you do not remember what you were told?" Defendant responded, "No. I just remember speaking to the judge with an interpreter. I just remember being asked, and I said that I was guilty. At that time, I wasn't told anything about immigration. I ended up finding out when I was taken, and then I ended up in LA, and that's when I found out that I was gonna be handed over to immigration. And that was right around the time that I was going to get released."

On cross-examination, the People asked defendant whether he had offered any evidence that he was ever a permanent legal resident. Defense counsel objected. The court noted, "I'm . . . looking at the criminal history submitted in the prosecutor's brief, which would call into doubt whether [defendant] was ever a legal permanent resident."

The court then asked defendant whether he was ever a legal permanent resident. Defendant responded that he was, and that it had never been taken away. The court inquired, "Except for when they deported you." Defendant agreed, "Up until [19]98 when I was deported."

When asked whether he wrote the portion of his declaration reading, "'As my conviction was only months, I did not understand that this conviction would make me inadmissible,'" defendant said, "It was what I was told and given."

With respect to defendant's alleged prior convictions and deportations, defense counsel argued "mistakes get made." The court responded, "I spent some time during our hearing studying the rap sheet and the federal printout, checking birth dates and names, and I was concerned about those issues, too. . . . But given the criminal history, I'm pretty confident that the rap sheet [i]s correct. Certainly looks like that way to me."

With respect to the purported delay, the People argued, "Again, the deportation that is acknowledged by the witness happened in 1998. That was well before the passage of the statute. The statute was passed, and then eight years elapsed before we wound up here. Even seven if you count for the filing the motion and the time. I would say that that is not an excusable delay given what we have been provided."

12

The court found that there was insufficient evidence for it to make a finding of ineffective assistance of counsel. In particular, the court noted that defendant had failed to give notice to counsel who represented him at the entry of his plea, as required by section 1473.7, subdivision (h). "It's not clear whether the defendant was advised of the immigration consequences other than it was read by the interpreter from the plea. And like I said before, what was presumably told to him by Judge McCarville, pursuant to Penal Code section 1016.5. But what is clear is I have no evidence of any affirmative misrepresentation."

The court further noted, "The issue, as it turns out, with this criminal history in many ways is we have two issues: The untimeliness and the prejudice. And I think on both of those issues, the defendant's motion fails. There's no reason for the delay. And quite frankly, it is eight years, seven years, without explanation."

"And with the criminal history that he has, which is—it's not just one case. The criminal history is overwhelming. I can't see how this one case, not with what I have in terms of the evidence that I have, would make any difference. [¶] So there's no prejudice from this case. And there's certainly no evidence that the defendant would have accepted a plea to an immigration-safe crime had one been offered. I don't have any evidence about what was offered or wasn't offered. It sounds to me, from what I have, is the defendant was happy to get his two years because he didn't have very much time to do, and he wanted to resolve the case." The court denied defendant's motion finding that it was untimely and that defendant had not suffered any prejudice.

## II. DISCUSSION

Defendant contends the court erred in denying his motion. Specifically, defendant maintains the court erred in excluding his declaration from evidence, in determining that his motion was untimely, and in finding that defendant had failed to establish prejudicial error in his understanding of the immigration consequences of his plea.

We agree the court erred in excluding defendant's declaration from evidence. However, we hold that defendant failed to establish that he acted diligently in requesting relief and that the court properly found he failed to establish prejudicial error.

"Penal Code section 1473.7 allows noncitizens who have served their sentences to vacate a conviction if they can establish by a preponderance of the evidence that their conviction is 'legally invalid due to prejudicial error damaging [their] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' [Citation.] To establish prejudicial error, a defendant must demonstrate a 'reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences' [citation] and must corroborate any assertions with ""objective evidence"" [citation]." (*People v. Espinoza* (2023) 14 Cal.5th 311, 316 (*Espinoza*).) "[T]he moving party shall also establish that the conviction or sentence being challenged is currently causing or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization." (§ 1473.7, subd. (f)(1).)

A.  Declaration

Defendant maintains the court erred in excluding his declaration from evidence.  We agree.

"A defendant must provide ""objective evidence"" to corroborate factual assertions.  [Citation.]  Objective evidence includes facts provided *by declarations. . . .*"  (*Espinoza*, *supra*, 14 Cal.5th at p. 321, italics added; see *People v. Vivar* (2021) 11 Cal.5th 510, 530 (*Vivar*).)  On a section 1473.7 motion, "when the trial court's findings 'derive entirely from written *declarations* and other documents,' the trial court and the reviewing court '"are in the same position,"' and no deference is owed.  [Citation.]"  (*Espinoza*, at p. 320 [Holding, based in part on the defendant's declaration, that he made a showing of prejudicial error], citing *Vivar*, at p. 528 [Similarly concluding, based in part on the defendant's declaration, that he had established prejudicial error].)

Defendants regularly submit, and courts regularly consider, declarations in support of section 1473.7 motions.  (E.g., *People v. Camacho* (2019) 32 Cal.App.5th 998, 1001 (*Camacho*); *People v. Mejia* (2019) 36 Cal.App.5th 859, 870 (*Mejia*); *People v. DeJesus* (2019) 37 Cal.App.5th 1124, 1128-1129 (*DeJesus*); *People v. Ogunmowo* (2018) 23 Cal.App.5th 67, 78-79.)  Thus, declarations are not only a proper manner of supporting a section 1473.7 motion, but they are also implicitly requisite and not inadmissible hearsay, particularly where, as here, the People can cross-examine the defendant on the assertions in the declaration when the defendant testifies.  (See *In re Mancillas* (2016) 2 Cal.App.5th 896, 905 [Declarations in support of the defendant's habeas petition were not

inadmissible hearsay because they were based on the defendant's personal knowledge].) The court erred in excluding defendant's declaration from evidence.

## B. Timeliness

"[T]he moving party must . . . make a showing regarding the timeliness of the motion." (*People v. Gregor* (2022) 82 Cal.App.5th 147, 157 (*Gregor*).) A motion may be deemed untimely filed if it was not filed with reasonable diligence after the party received a notice to appear in immigration court or a final removal order has been issued. (§ 1473.7, subd. (b)(2)(A) & (B).) "[A] court assessing the timeliness of a section 1473.7 motion must determine when the petitioner would have had reason to seek legal help or otherwise investigate new forms of postconviction relief, and evaluate diligence from that point forward, in light of all the circumstances." (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 753 (*Alatorre*).)

"[A]s a 'general rule' motions submitted by petitioners no longer in custody [are] timely [citation], but as an exception to that rule, if a trial court finds that a petitioner did not exercise reasonable diligence, the court may exercise its discretion to deem a motion untimely." (*Alatorre*, *supra*, 70 Cal.App.5th at p. 757.) "[T]he Legislature specifically considered but ultimately rejected the statute's effective date as a possible event that could trigger a petitioner's responsibility to exercise diligence." (*Id.* at p. 760.) Thus, in determining timeliness, courts should look to what event in the defendant's "life that occurred *after* section 1473.7 became effective would have given him 'a reason to look

16

for the existence of [new] legal grounds for relief' or, at a minimum, 'put him on notice of the need to investigate?' [Citation.]" (*Id*. at p. 762, fn. omitted.)

"[I]t is most consistent with the meaning and purpose of section 1473.7 to evaluate reasonable diligence in cases where the petitioner's triggering events predated the law by determining whether or when the petitioner had a reason to inquire about new legal grounds for relief, and assessing the reasonableness of the petitioner's diligence from that point forward." (*Alatorre*, *supra*, 70 Cal.App.5th at p. 765.) "[O]nly reasonable ignorance equates to a reasonable delay. We trust trial courts in the first instance to assess whether a petitioner's delay in filing is reasonable or unreasonable given all the circumstances." (*Id*. at p. 766, fn. 22 [Finding as a matter of law that defendant's petition was timely where he hired counsel within a month of being referred to him].)

Here, defendant failed to adduce any evidence regarding the diligence with which he prosecuted his motion. Defendant's declaration reflects that he pled guilty in the instant case in 1997, and that while he was serving his two-year sentence, the Department of Homeland Security, which did not exist until 2001, "served me with a Notice, charging me with removal due to the conviction in this case, they will order me deported."

In 2021, defendant "obtained an immigration and humanitarian pass to go to grandchild's funeral, I complied with the rules and returned to Mexico after this immigration pass, I could have violated the laws and remained in the U.S. If you want the U.S. with that pass, you prefer to follow all the U.S. rules." Thus, according to defendant's own declaration, he knew he faced immigration consequences for his plea as

17

early as 1997, and he continued to be aware of those consequences in 2021, years after the effective date of section 1473.7.

Defendant's testimony at the hearing fares him no better. Defendant testified he was deported from prison in 1998. When asked why it took him 26 years to seek vacation of conviction, defendant responded, "Because I had in the past done it, but they would tell me no. And then that happened with the Court and the system being down, so I tried several times, and it was rejected." Defendant gave no explanation of what attempts to vacate his conviction he had previously made, when they were made, or when he became aware of section 1473.7 relief.

Defendant further testified, "I tried again because my—I'm trying now because my daughter is very ill, she's on dialysis, she's diabetic. My wife is alone and helping her. Helping her daughter because she is ill. She has diabet[es], she's on dialysis. And my wife is old and needs some help." Again, defendant gave no testimony as to when his 43-year-old daughter became ill, when she needed his help, and when he learned of section 1473.7 relief. In fact, a rationale inference of defendant's testimony is that he knew of section 1473.7 relief but did not seek relief under its auspices until his daughter became sick and needed his help.

Although "the Legislature specifically considered but ultimately rejected the statute's effective date as a possible event that could trigger a petitioner's responsibility to exercise diligence" (*Alatorre*, *supra*, 70 Cal.App.5th at p. 760), defendant gave the court no other date upon which to evaluate his diligence in filing the motion. Thus, we trust

the court's assessment that defendant did not act diligently in filing the motion seven or eight years after the effective date of the statute, with no other explanation for the delay. (*Id*. at p. 757.)  Therefore, the court acted within its discretion in determining that defendant failed to satisfy his burden of establishing diligence.  (*Gregor*, *supra*, 82 Cal.App.5th at p. 157.)

C.  Prejudicial Error

Even assuming arguendo that defendant timely filed his motion, defendant failed to establish prejudicial error.

"To prevail under section 1473.7, a defendant must demonstrate that his conviction is 'legally invalid due to prejudicial error damaging [his or her] ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.' [Citation.]  The defendant must first show that he did not meaningfully understand the immigration consequences of his plea.  Next, the defendant must show that his misunderstanding constituted prejudicial error. '[P]rejudicial error . . . means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.' [Citation.]" (*Espinoza*, *supra*, 14 Cal.5th at p. 319.)

"We apply independent review to evaluate whether a defendant has demonstrated a reasonable probability that he would have rejected the plea offer had he understood its immigration consequences.  [Citation.]  '"[U]nder independent review, an appellate court

19

exercises its independent judgment to determine whether the facts satisfy the rule of law.'" [Citation.] When courts engage in independent review, they must give deference to the trial court's factual determinations if they are based on '"'the credibility of witnesses the [superior court] heard and observed.'"' [Citation.]" (*Espinoza*, *supra*, 14 Cal.5th at pp. 319-320.)

"To determine whether there is a reasonable probability a defendant would have rejected a plea offer if he had understood its immigration consequences, courts must 'consider the totality of the circumstances.' [Citation.] 'Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible.' [Citations.] Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial. [Citation.] These factors are not exhaustive, and no single type of evidence is a prerequisite to relief." (*Espinoza*, *supra*, 14 Cal.5th at pp. 320-321.)

"A defendant must provide '"objective evidence"' to corroborate factual assertions. [Citation.] Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced. [Citations.]" (*Espinoza*, *supra*, 14 Cal.5th at p. 321.) "A court may only issue a specific finding of ineffective

assistance of counsel as a result of a [section 1473.7] motion . . . if the attorney found to be ineffective was given timely advance notice of the motion hearing by the moving party or the prosecutor . . . ."  (§ 1473.7, subd. (h).)

"'Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.  [Rather, they] should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences.'"  (*DeJesus*, *supra*, 37 Cal.App.5th at p. 1134; accord, *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 322.)

Here, defendant failed to establish either error or prejudice.  Defendant initialed a provision of his plea agreement reading, "I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, or denial of naturalization may result from a conviction of the offense(s) to which I plead . . . ."  Defendant initialed another provision of the agreement reading, "I have had sufficient time to consult with my attorney . . . .  My lawyer has explained everything on this declaration to me, and I have had sufficient time to consider the meaning of each statement.  I have personally placed my initials on certain boxes on this declaration to signify that I fully understand and adopt as my own each of the statements which correspond to those boxes."  Defendant signed the agreement indicating, under penalty of perjury, "that the foregoing is true and correct . . . ."

An interpreter signed the agreement under penalty of perjury, reflecting "that I translated the entire contents of this form from English to Spanish . . . in the presence of

21

and directly to the defendant in this case and that said defendant in his case subscribed to this document in my presence." Defense counsel signed the agreement, indicating "I personally read and explained the content of the above declaration to the defendant[,] [and] that I personally observed the defendant sign said declaration." The court signed the document reflecting that defendant understood the terms of the plea agreement.

Another document attached to defendant's motion reflects that the court advised defendant, "That if he/she is not citizen, a conviction of the offense with which he/she is charged may lead to deportation, exclusion from admission to this country, or denial of naturalization." Attached to the People's opposition is a translation into Spanish of portions of the plea agreement, which includes a warning about the immigration consequences of the plea. Defendant signed that form too.

Against this backdrop, we note that in his declaration, defendant did not even assert that defense counsel did not advise him of the immigration consequences of his plea. Rather, he simply claimed that he did not *remember* if anyone informed him of the immigration consequences of his plea: "I don't remember [defense counsel], or anyone who asked me about my immigration status." "I don't remember that either the judge or the interpreter ever mentioned the immigration consequences." "I don't remember the interpreter translating the change of plea form for me word for word, explaining what each section meant." (*Espinoza*, *supra*, 14 Cal.5th at p. 316-317 [the defendant affirmatively asserted counsel did not inform him of the immigration consequences of his plea].) Thus, in his declaration, defendant did not even assert any error on the part of

counsel, the interpreter, or the court in explaining the immigration consequences of his plea.

At the hearing, defendant testified that he was represented by two attorneys when entering the plea. He testified that his primary attorney was present for entry of the plea but not sentencing; however, the minute order directly contradicts this as both occurred contemporaneously. Defendant testified at the hearing that no one advised him of the immigration consequences of his plea, which contrasts with both his declaration that he simply did not *remember* anyone so advising him and the documents he signed and initialed reflecting he was warned of the immigration consequences of the plea.

Defendant testified that he always entered the United States legally, which is contradicted by the People's documents reflecting that defendant repeatedly entered the country illegally. Defendant testified that he did not remember initialing the provisions of the plea agreement, but he did remember signing it. Of course, defendant did remember what he had eaten for breakfast and dinner on that date.

Defendant denied being arrested on May 14, 1970, for "illegal entry and aiding and abetting illegal entry of other illegal aliens," which, again, conflicts with the People's exhibits reflecting that he was. Defendant denied being arrested for reentry after deportation and bringing aliens into the United States in 2011, despite the People's documents reflecting otherwise. Defendant denied being deported prior to 1998, again conflicting with the People's documents establishing multiple prior deportations. Defendant denied suffering any felony convictions prior to 1997, which is, yet again,

contrary to the People's documents and the charging documents in the instant case, reflecting multiple prior felony convictions.

Defense counsel objected when the People asked defendant on cross-examination whether he had any documentary evidence of his assertion in his declaration that he had been a lawful permanent resident. The court asked, "Was he ever a permanent resident?" The People responded, "I don't believe he was." The court replied, "I know." "I'm just looking at the criminal history submitted in the prosecutor's brief, which would call into doubt whether he was ever a legal permanent resident." Regardless, defendant testified that he was a lawful permanent resident between 1964 and 1997, when he was convicted of the instant offenses.

The court later noted of defendant's criminal history, "I'm pretty confident that the rap sheet [i]s correct. Certainly looks like that way to me." "And with the criminal history that he has, which is—it's not just one case. The criminal history is overwhelming."

The court's statements reflect an implicit, if not explicit determination that defendant's testimony was uncredible. We "must give deference to the trial court's factual determinations if they are based on ""the credibility of witnesses the [superior court] heard and observed."""" (*Espinoza*, *supra*, 14 Cal.5th at p. 320.) We agree with the court that defendant's testimony was uncredible considering it conflicted, as noted *ante*, with his own statements in his declaration and the documents establishing

defendant's prior criminal and immigration history. Thus, defendant failed his burden to establish either error or prejudice.

Defendant complains that the court erred because it "assumed that the trial judge must have given an oral immigration warning in compliance with the statute, even though there is no plea transcript available in this matter." First, we assume, unless otherwise proven, that the trial court acted appropriately. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042 ["Absent evidence to the contrary, we presume that the trial court knew the law and followed it"].) Thus, the court properly assumed the trial court gave the oral immigration warning in compliance with the law.

Second, it was defendant's responsibility to provide the court below with a copy of the plea transcript. (*People v. Diaz* (2022) 76 Cal.App.5th 102, 112-113 [Defendant bears the burden of proof on a section 1473.7 motion]; *People v. Bravo* (2021) 69 Cal.App.5th 1063, 1074 [same]; *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 662-663 [same].) Defendant's failure to provide the court with the transcript of the plea hearing works against him not for him.[7] Third, a document attached to defendant's motion does reflect that the court advised defendant, "That if he/she is not a citizen, a conviction of the offense with which he/she is charged may lead to deportation, exclusion from admission to this country, or denial of naturalization."

---

[7] As noted in footnote 3 *ante*, defendant moved this court to augment the record with additional materials, which we granted. Defendant could have but did not move this court to augment the record with the transcript of the plea and sentencing hearing.

Defendant, relying on *People v. Ruiz* (2020) 49 Cal.App.5th 1061, 1066 (*Ruiz*) contends that, "Even if this Court assumes defense counsel reviewed the plea form verbatim with [defendant], the plea form was inadequate to provide a meaningful understanding of the mandatory nature of the immigration consequences that attached to the plea." We disagree with the holding in *Ruiz* that a section 1016.5 advisement is per se invalid. (*Ruiz*, at p. 1065 ["Defendants must be advised that they *will be* deported, excluded, and denied naturalization as a *mandatory* consequence of the conviction"]; contra, *People v. Arendtsz* (2016) 247 Cal.App.4th 613, 617 [advisement defendant's plea "would" rather than "may" have immigration consequences complied with the requirements of § 1016.5]; *People v. Araujo* (2016) 243 Cal.App.4th 759, 762 ["The advisement need not be in the exact language of section 1016.5 and can be in writing. Substantial compliance is all that is required."].)

The court in *Ruiz* relied on our Supreme Court's holding in *People v. Patterson* (2017) 2 Cal.5th 885 (*Patterson*),[8] that a defendant's receipt of a standard section 1016.5 advisement that the plea "may" have negative immigration consequences did not operate as a per se bar to the filing of a section 1018 motion. (*Patterson*, at pp. 895-896.) Based

---

[8] *Patterson*, in turn, relied on the United States Supreme Court's decision in *Padilla v. Kentucky* (2010) 559 U.S. 356, which held, "When the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear." (*Id*. at p. 369, fn. omitted.) *Padilla* relates to *counsel's* duty to advise of the negative immigration consequences of a plea, not the court's duty to so advise. Thus, *Padilla* does not apply to a motion brought under section 1016.5.

on this, *Ruiz* held, "Defendants must be advised that they *will be* deported, excluded, and denied naturalization as a *mandatory* consequence of the conviction." (*Ruiz*, *supra*, 49 Cal.App.5th at p. 1065.)

Of course, *Patterson* said nothing of the sort. *Patterson* stands for the proposition that the standard section 1016.5 advisement *may not*, *in and of itself*, be sufficient evidence to defend against a section 1018 motion. (*Patterson*, *supra*, 2 Cal.5th at pp. 895-899.) It did not change the standard advisement required by section 1016.5, it did not apply to anything other than a section 1018 motion, it did not render its holding retroactive, and it certainly did not hold that the section 1016.5 advisement was per se invalid. (*Patterson*, at pp. 895-899; *Ruiz*, *supra*, 49 Cal.App.5th at pp. 1070-1071 (dis. opn. of Yegan, J.) ["*Patterson* does not resolve or even mention retroactivity."].)

Rather, *Patterson* simply allowed a defendant who had received the standard section 1016.5 advisement to attempt to convince a court, acting in its discretion, that despite that advisement, the court should allow the defendant to withdraw his plea pursuant to section 1018. Moreover, here, defendant's section 1473.7 motion challenges defense counsel's advisements, not the court's. Thus, both this court and the court below can properly consider the court's advisement of defendant regarding the immigration consequences of his plea, along with counsel's and his interpreter's, in determining there was no error in defendant's understanding of those consequences.

Furthermore, to the extent defendant claims that, regardless of the explanations given him by defense counsel, the interpreter, and the court regarding the immigration

consequences of his plea, that he still did not understand, his self-serving declaration and testimony are not corroborated by contemporaneous evidence such as an affidavit and/or testimony by counsel who represented defendant at the time of the plea, the prosecutor, or the interpreter. (*DeJesus*, *supra*, 37 Cal.App.5th at p. 1134; *Camacho*, *supra*, 32 Cal.App.5th at p. 1009 ["[D]efendant's claims of error were supported by his former attorney's undisputed testimony . . . that he misunderstood the potential immigration consequences . . . and that he did not explore possible alternatives to pleading to an aggravated felony"]; *Vivar*, *supra*, 11 Cal.5th at p. 519 [The defendant provided counsel's e-mail correspondence and handwritten notes that she did not "advise him as to the actual immigration consequences of a plea . . . or any other plea"].)

Here, there is no evidence that defendant even tried to obtain such corroborating evidence. (*Espinoza*, *supra*, 14 Cal.5th at p. 325 ["Both the district attorney and Espinoza's counsel represented to the court that they tried, without success, to contact the attorney who represented Espinoza at the time his plea was entered."].) Thus, defendant failed his burden of offering contemporaneous objective evidence to support his declaration and testimony.

In a footnote in his reply brief, defendant challenges the People's contention that defendant's "utter failure to examine defense counsel at the hearing was unjustifiable." Defendant asserts this is because there is no attorney listed on the State Bar's website by the name of the attorney, who the minute order for plea and sentencing hearing indicates represented defendant, Richard Nahigan. In fact, defendant warns that "the possibility

that someone who was not actually an attorney appeared on behalf of [defendant] at the time of his plea raises serious concerns about the representation he received, including any immigration-related advice that may have been provided." Defendant requests that we take judicial notice of this "fact."

First, we note that, "To obtain judicial notice by a reviewing court under Evidence Code section 459, a party must serve and file a separate motion with a proposed order." (Cal. Rules of Court, rules 8.252(a)(1) & 8.366(a).) "We note that [counsel] did not file a separate motion requesting judicial notice, as required by California Rules of Court, rule 8.252(a)(1). However, in the absence of any objection by the parties, we consider this request." (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 484, fn. 7.)

Second, a simple Google search for the name "Richard Nahigan" turns up counsel by the name of Richard Nahigian, one letter off from that listed in the minute order, who specializes in criminal law in California and has been licensed in this state since 1970. (<https://www.richardnahigian.com/> [as of April 13, 2026]; <https://apps.calbar.ca.gov/attorney/Licensee/Detail/45675> [as of April 13, 2026].) Third, Richard Nahigian's name, with the correct spelling, is listed as representing defendant in this case on the publicly accessible case information on the County of San Bernardino Superior Court's website.

Fourth, we also note that a search of the State Bar's website reflects information for the two other counsel who also represented defendant at the plea and sentencing

29

hearing, William Gebbie and Celia Torres, neither of whom defendant apparently attempted to obtain a declaration from or subpoenaed for the hearing. (<https://apps.calbar.ca.gov/attorney/Licensee/Detail/45212> [as of April 13, 2026]; <https://apps.calbar.ca.gov/attorney/Licensee/Detail/69477> [as of April 13, 2026].)

Fifth and finally, we note that had defendant provided this court with a transcript of the plea hearing, it is likely defendant's counsel's name would have appeared correctly spelled.  Thus, defense counsel's failure to even attempt to obtain declarations from and/or subpoena defendant's counsel, who were present at the plea agreement and sentencing is "unjustifiable."

Additionally, defendant "fails to offer any affirmative evidence from which a reasonable fact finder could conclude that his trial attorney failed to negotiate or consider an immigration neutral disposition.  He did not offer any evidence from the prosecutor, [his counsel], or an immigration expert on this point.  Furthermore, he fails to identify any 'immigration-neutral disposition to which the prosecutor was reasonably likely to agree.'" (*DeJesus*, *supra*, 37 Cal.App.5th at p. 1136; see *Espinoza*, *supra*, 14 Cal.5th at p. 317 [The defendant provided "a declaration from an immigration attorney . . . that there were immigration-safe alternatives his counsel could have pursued."]; *People v. Olvera* (2018) 24 Cal.App.5th 1112, 1118 [Defendant did not offer an expert declaration opining that alternative, nondeportable dispositions would have been available and acceptable by the prosecutor.]; *People v. Bautista* (2004) 115 Cal.App.4th 229, 239-240 & fns. 7-8 [Defendant provided the court an affidavit from an attorney with extensive

experience representing immigrants in criminal court, who opined that the defendant's plea counsel provided prejudicial ineffective assistance of counsel by failing to attempt to negotiate a plea to a nondeportable offense.]; *Vivar*, *supra*, 11 Cal.5th at p. 531 [The defendant provided an "uncontradicted declaration from [an] immigration expert [who wrote that the defendant] could [have] entered . . . a plea without subjecting himself to mandatory deportation," and the defendant offered evidence he had initially been offered a plea agreement that would have completely avoided any immigration consequences].)

Defense counsel below filed a declaration speculating that defendant could have pled guilty to lesser offenses without immigration consequences, such as possession of "chorionic gonadotropin or khat," "to transportation for personal use, offering to transport or offering to give away small amount," or to accessory after the fact.[9]  Defense counsel averred that his practice consists primarily of criminal and immigration law cases, but by virtue of his advocacy on behalf of defendant, he was decidedly not objective.

Here, defendant offered no evidence that defense counsel at the time of the plea did not attempt to negotiate an immigration neutral disposition.  Nor does counsel explain why the People or court would have allowed defendant to plea to possession of drugs he did not possess; to transporting or offering a "small amount" or "for personal use," when defendant was found transporting 168.24 pounds of marijuana; or to accessory *after* the fact, when defendant was caught in the act of transporting the marijuana.

---

[9]  However, see footnote 5 *ante* for the evidentiary value of defense counsel's declaration.

Here, defendant fails to offer any independent, objective, corroborative evidence that would have supported a choice to reject the plea bargain and go to trial. (*DeJesus, supra*, 37 Cal.App.5th at pp. 1135-1137 [no showing of strength of case against defendant]; *Mejia, supra*, 36 Cal.App.5th at p. 872 ["[T]he lower court acknowledged, there are some lingering questions about the strength of the underlying evidence: 'The preliminary hearing transcript leaves several remaining uncertainties . . . .'"]; *Vivar, supra*, 11 Cal.5th at p. 521 [The defendant "asked 'a specific question about deportation' [citation], a question that 'required an attorney to research and apprise their client of the immigration consequences of a plea'"].) Defendant could have, but did not, offer a declaration and/or testimony of his defense counsel or the prosecutor with respect to the evidence against him. Defendant could have provided the preliminary hearing transcript but did not.

Here, according to the police reports, the evidence against defendant was overwhelming, consisting of being caught in the act and recorded effectively admitting to the crime. Defendant's plea was a negotiated disposition, not a plea to the sheet; thus, he obtained an express benefit from the bargain. (*Mejia, supra*, 36 Cal.App.5th at p. 872 ["[U]nlike most guilty pleas, this was a 'straight up' plea directly to the court rather than a negotiated disposition"].) Likewise, defendant had an extensive prior criminal record, which included multiple prior felony convictions. (*Espinoza, supra*, 14 Cal.5th at p. 324 ["Espinoza's lack of a criminal record . . . support[s] his assertion that he had reason to expect or hope for a plea bargain without immigration consequences."]; *Camacho, supra*,

32 Cal.App.5th at p. 1011, fn. omitted ["Defendant has no other adult criminal convictions"]; *Mejia*, at p. 873 ["Mejia had no criminal record"]; *People v. Lopez* (2022) 83 Cal.App.5th 698, 713 [The defendant "had no previous encounters with the criminal justice system during which he might have received legal advice about the immigration consequences of a conviction"]; See *People v. Castaneda* (1995) 37 Cal.App.4th 1612, 1616, fn. omitted [The defendant's section 1016.5 motion failed in part because "as a result of defendant's prior involvement both with the [Immigration and Naturalization Service] and with the criminal justice system, defendant knew of the potential immigration consequences of his plea"].)

Defendant had been charged with four prior strike convictions, meaning defendant was facing an indeterminate term of imprisonment of 25 years to life. Instead, pursuant to the negotiated disposition, defendant received the low term of two years of imprisonment. It is highly unlikely defendant would have taken the matter to trial facing almost certain conviction versus the two years of imprisonment pursuant to the negotiated plea.

Defendant's extensive prior criminal and immigration history is relevant to both whether the prosecutor would have been likely to offer him a plea agreement to an immigration free charge, and whether defendant understood the immigration consequences of his plea. Here, defendant's extensive criminal and immigration history reflects upon the unlikelihood the prosecutor would have negotiated an immigration free

33

plea and establishes that defendant very well understood the immigration consequences of his plea.

Finally, defendant offered no evidence that his conviction for the instant offenses "is currently causing or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization." (§ 1473.7, subd. (f)(1).) Defendant's extensive criminal and immigration history both prior to and after the instant offenses makes it highly improbable that the vacation of his convictions here would make him eligible to legally return to the United States. It is for those prior offenses that defendant became and remains ineligible for reentry. As noted *ante*, defendant had already been deported four times prior to his conviction for the instant offenses.

The totality of the circumstances here, including the multiple advisements defendant received regarding the immigration consequences of the plea, the lack of credibility of his declaration and testimony, the charges against him, the strength of the evidence against him, his criminal record, his immigration record, and the benefit defendant received by entering into a negotiated disposition support the court's determination that defendant failed to show any error or prejudice regarding the immigration consequences of his plea. We independently agree with the court's determination.

## III. DISPOSITION

The order denying defendant's section 1473.7 motion is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.